IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHRIS NJOS,                                      )
                                                 )
        Plaintiff,                               )
                                                 )
        v.                                       )
                                                 )     Case No.   18-cv-598-RJD
DR. JOHN COE, NICOLE MARSHALL, DR.               )
MOHAMMED SIDDIQUI, ANGIE                         )
WALTER, JACQUELINE LASHBROOK,                    )
JOHN BALDWIN, and WEXFORD HEALTH                 )
SOURCES, INC.,                                   )
                                                 )
        Defendants.                              )

## ORDER

**DALY, Magistrate Judge:**

 Plaintiff Chris Njos, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging he was provided inadequate medical treatment while at Menard Correctional Center.  Plaintiff's complaint was screened under 28 U.S.C. § 1915A, and he is proceeding on the following claims:

> Count One:    Coe, Marshall, Siddiqui, Walter, Lashbrook, and Baldwin were deliberately indifferent to Plaintiff's neck pain and high blood pressure in violation of the Eighth Amendment.

> Count Two:    Wexford Health Sources had a policy of delaying and denying inmates medical care in violation of the Eighth Amendment.

 This matter is now before the Court on the Motion for Summary Judgment filed by Defendants Dr. Siddiqui, Dr. Coe, and Wexford Health Sources, Inc. (Doc. 80), and the Motion for Summary Judgment filed by Defendants Baldwin, Lashbrook, Walter, and Marshall (Doc. 88). For the reasons set forth below, the motions are **GRANTED**.

**Factual Background**

Plaintiff's claims in this matter arise while he was incarcerated at Menard Correctional Center ("Menard").   In December 2016, while at Menard, Plaintiff began suffering ear pain and reported it to the healthcare unit (Deposition of Chris Njos, Doc. 81-1 at 19).   Plaintiff was seen by a nurse on December 20, 2016 and reported a small lump on his neck and pain and popping in his ear (*Id.*; Plaintiff's Medical Records, Doc. 81-2 at 69).   Plaintiff was referred to a physician and a nurse practitioner saw him on January 3, 2017 (Doc. 81-1 at 20; Doc. 81-2 at 70).   The nurse practitioner ordered antibiotics, allergy medication, and scheduled Plaintiff for a follow-up appointment (*Id.*).   During his follow-up appointment on January 11, 2017, Plaintiff reported the pain in his left ear was better, but he still had some neck stiffness (Doc. 81-2 at 71).   The nurse practitioner noted an enlarged cervical lymph node behind Plaintiff's left ear (*Id.*).   Plaintiff was continued on antibiotics and antihistamines, and x-rays of his neck and sinuses were ordered (Doc. 81-1 at 20; Doc. 81-2 at 71).   The x-rays were completed on January 25, 2017, which indicated minimal clouding in the ethmoids (*Id.* at 234).

On February 22, 2017, Plaintiff reported to the healthcare unit for complaints of dizziness and vertigo, and he was referred to a provider (Doc. 81-2 at 74).   Plaintiff saw Defendant Dr. Siddiqui on February 27, 2017 for complaints of dizziness (Doc. 81-1 at 20; Doc. 81-2 at 76).   Plaintiff also reported he could feel a lymph node in his neck (*Id.*).   Plaintiff asserts he also complained of neck pain during this appointment (Declaration of Chris Njos, Doc. 90-8 at ¶ 5).   Dr. Siddiqui did not find any palpable lumps near Plaintiff's lymph nodes upon examination (Doc. 81-2 at 76).   Dr. Siddiqui noted Plaintiff's blood pressure was elevated and changed Plaintiff's blood pressure medication by adding Norvasc (*Id.*).   Dr. Siddiqui also ordered blood pressure checks to monitor Plaintiff's blood pressure more closely (*Id.*).   Plaintiff's blood pressure

medication was increased on March 19, 2017 by a nurse practitioner due to his continued elevated blood pressure and complaints of dizziness (*Id.* at 79).   On March 25, 2017, Plaintiff complained to the nurse practitioner of neck and back of the head pain, and she ordered x-rays of Plaintiff's skull and cervical spine with a follow-up appointment (*Id.* at 80).   Plaintiff was a "no show" for his follow-up visit on April 6, 2017; however, Plaintiff asserts he was on a family visit that day, which caused him to arrive approximately 50 minutes late and the nurse practitioner had left by the time he arrived (Doc. 81-1 at 71; Doc. 81-2 at 82).   The x-rays were completed on April 12, 2017 with unremarkable findings (*Id.* at 235).   It was noted that CT imaging is a more sensitive modality for evaluation of neck pain and dizziness (*Id.*).

On April 9, 2017, Plaintiff was examined by Defendant Marshall for hypertension and elevated blood pressure (Doc. 81-2 at 85-86).   Plaintiff's blood pressure was checked twice with readings of 170/100 and 132/100 (*Id.* at 85).   Plaintiff reported dizziness, blurred vision, headache, and shortness of breath (*Id.*).   Plaintiff's pulse was 100, but it was noted that his heart tones and rhythm were "regular" (*Id.* at 86).   Marshall referred Plaintiff to the medical doctor (*id.* at 85).   It is unclear if Plaintiff was scheduled to be seen by a doctor despite Marshall's referral. Plaintiff was seen by Defendant Dr. Coe for the first time on May 4, 2017 for complaints of ear pain (Doc. 81-1 at 21; Doc. 81-2 at 92).   Plaintiff was seen in the housing unit for this appointment (Doc. 81-1 at 21-22).   Plaintiff reported prior headaches followed by dizziness (Doc. 81-2 at 92).   Dr. Coe palpated Plaintiff's scalp and neck, noting some tenderness in the back of the scalp (Doc. 81-1 at 22; Doc. 81-2 at 92).   Dr. Coe diagnosed Plaintiff with head pain and vertigo problems (*Id.*).   Dr. Coe explained that he wanted to check Plaintiff's eyes and ears, but because he was in the housing unit, he did not have the tools to do so (81-6 at 7; 81-2 at 92).   Dr. Coe ordered a follow-up appointment in the healthcare unit for the next week (*Id.*).   It does not appear

Plaintiff was seen by Dr. Coe for a follow-up appointment the next week, and Plaintiff testified he was not given a pass for a follow-up (Doc. 81-1 at 22).   Dr. Coe does not schedule follow-up appointments himself; rather, it is the role of the nurse to schedule the same (Doc. 81-6 at 12).

Plaintiff was next seen for complaints of ear pain and a headache on May 13, 2017 by Defendant Nurse Marshall after he put in for a sick call pass (Doc. 81-1 at 23; Doc. 81-2 at 93). Marshall noted white matter in Plaintiff's left ear, and referred him to the doctor (*Id.*).   Plaintiff was supposed to see Dr. Coe on May 19, 2017, but that appointment was canceled (Doc. 81-1 at 23).   On May 24, 2017, Plaintiff saw Dr. Coe for a routine physical rather than a follow-up for his complaints to Nurse Marshall (Doc. 81-2 at 67-68).   Upon examination, Dr. Coe assessed that Plaintiff had controlled hypertension, a deviated septum, and a prior left clavicle facture with instability (*Id.*).   Dr. Coe also documented mild left scalp anterior tenderness and tenderness in Plaintiff's lower back (*Id.*).   Plaintiff testified he complained to Dr. Coe of pain to his ear and shoulder, but Dr. Coe documented that his ear and shoulder were normal (Doc. 81-1 at 23; Doc. 81-2 at 67).   Dr. Coe ordered Motrin twice a day to address pain associated with tenderness in Plaintiff's back and back of his head, as well as saline nose spray for Plaintiff's deviated septum (*Id.*).   Plaintiff saw Dr. Coe for the last time on June 8, 2017 to address Plaintiff's complaints of ear pain (Doc. 81-6 at 9; Doc. 81-2 at 95).   Dr. Coe examined Plaintiff's ear and found that the ear canal appeared normal, but was tender at the 5 o'clock position at the ear wax gland and mastoid (Doc. 81-6 at 9; Doc. 81-2 at 95).   Dr. Coe diagnosed Plaintiff with an ear wax gland problem and ordered ear drops and Motrin on a more frequent basis (*Id.*).   Plaintiff did not complain of dizziness and Plaintiff's blood pressure was normal (Doc. 81-1 at 31; Doc. 81-2 at 95).   Plaintiff asserts Dr. Coe's examination of his ear caused him to "jump away" because he was so rough (Doc. 81-1 at 29).   Plaintiff also testified that Dr. Coe told Plaintiff he had AIDS and, in response

to Plaintiff expressing his concerns about his medical conditions, Plaintiff asserts Dr. Coe told him that "people die here" (*Id.* at 24, 29).   Dr. Coe testified he does not believe he would have told Plaintiff he had AIDS because it is not in the medical chart, but he has no independent recollection of this appointment (Doc. 90-6 at 9-10).   Dr. Coe received no further communication from Plaintiff and was never informed that Plaintiff had further complaints (Doc. 81-6 at 12).

Subsequently, on June 10, 2017, Plaintiff fell in the chow hall and was taken to the healthcare unit (Doc. 81-1 at 32; Doc. 81-2 at 97-98).   Plaintiff, who has a history of petite mal seizures, is unsure if he had a seizure or what may have otherwise caused the fall (Doc. 81-1 at 32).   Plaintiff was initially examined at 9:30 a.m. by Nurse Kirk (Doc. 81-2 at 97-98).   Plaintiff's blood pressure was elevated at 160/100, and he testified he had taken his blood pressure medication the previous night (Doc. 81-1 at 32; Doc. 81-2 at 97).   Dr. Siddiqui was contacted and ordered seizure medication, 23 hours of observation in the infirmary, and blood pressure checks every four hours (*Id.* at 97-100).   Defendant Nurse Walters examined Plaintiff at 9:45 a.m. on June 10, 2017 (*Id.* at 99).   At this time, Plaintiff's blood pressure was 150/102 (*Id.*).   Walter spoke with Dr. Siddiqui to receive treatment orders via telephone (*Id.*).   Walter also examined Plaintiff again at 3:45 p.m. on June 10, 2017, wherein Walter documented Plaintiff stated he felt "okay" (*Id.* at 100).   Plaintiff does not remember telling Walter he felt okay, but only remembers Walter waking him up and checking his vitals (Doc. 81-1 at 59).   Plaintiff's blood pressure had normalized to 132/80 (Doc. 81-2 at 100).   Defendant Walter examined Plaintiff again at 6:45 p.m. on this same date (*Id.*).   Plaintiff's blood pressure was 130/70, and it was documented that Plaintiff did not have seizure activity while being observed (*Id.*).   Walter relayed Plaintiff's medical information to Dr. Siddiqui over the phone and Dr. Siddiqui ordered Plaintiff to be discharged from the 23-hour observation (*Id.*).   Plaintiff was discharged from the healthcare unit (*Id.*).

On June 11, 2017, Plaintiff went to the healthcare unit and reported pain of 8 out of 10 from his ear, to his neck, and down his back (Doc. 81-2 at 102).   Plaintiff was referred to the doctor (*Id.*).   Plaintiff saw Dr. Siddiqui on June 14, 2017 for a follow-up appointment (*Id.* at 103). Plaintiff complained of chronic pain to his upper neck and left cervical lymph nodes (*Id.*).   Dr. Siddiqui ordered a referral for CT scans of Plaintiff's head and neck, and a neurology consult for complaints of dizziness and neck pain (*Id.*).   Plaintiff has no complaints about the June 14, 2017 appointment with Dr. Siddiqui (Doc. 81-1 at 34).   The CT scans and neurology consultation were approved through the Collegial Review process on June 26, 2017, and the CT scans were completed on July 18, 2017 at St. Elizabeth's Hospital (Doc. 81-2 at 168-171).   The CT scans were not remarkable, noting only incidental findings on Plaintiff's major salivary gland and sinuses that had no clinical significance to Plaintiff's complaints (Doc. 81-5 at 10-11; Doc. 81-2 at 170-71).   Dr. Siddiqui saw Plaintiff for a follow-up on August 15, 2017 wherein Plaintiff complained of chronic occipital (back of head) headaches, pain in his upper back, and feelings of lightheadedness and shakiness (*Id.* at 116).   Dr. Siddiqui considered the CT reports that were negative and noted that a neurology consultation had already been approved (*Id.*).   Dr. Siddiqui requested that the medical records department attempt to have the appointment expedited (*Id.*).

On August 22, 2017, Plaintiff saw Dr. Lori Guyton, who conducted a full neurological exam that showed no weakness, no loss of sensation, no atrophy, and no other objective deficits (Doc. 81-2 at 172-176).   Dr. Guyton noted subjective tenderness in Plaintiff's cervical (neck) region (*Id.* at 175).   Dr. Guyton recommended Plaintiff lose weight, continue his current medication, begin physical therapy of the cervical spine, take a muscle relaxant, follow-up in 3-4 months, and undergo an MRI of his cervical spine (*Id.* at 176).   On September 22, 2017, Plaintiff saw Dr. Siddiqui for complaints of shoulder and neck pain with lightheadedness (*Id.* at 119). Dr.

Siddiqui noted that Plaintiff had been seen by a neurologist, but they had not yet received her report (*Id.*).   Dr. Siddiqui also noted the pervious CT of Plaintiff's head and neck were unremarkable (*Id.*).   With regard to Plaintiff's complaints of left shoulder pain, Dr. Siddiqui noted Plaintiff was previously evaluated in June 2016 with x-rays and a course of physical therapy, and ordered a follow-up x-ray to further assess the area (Doc. 81-5 at 14; Doc. 81-2 at 119).

On October 9, 2017, Dr. Guyton's office faxed a request to Menard seeking copies of Plaintiff's CT scans and labs, and enclosed a copy of Dr. Guyton's report (Doc. 81-2 at 122, 172-177).   The report was signed by Dr. Guyton on October 5, 2017 (*Id.* at 176).   The medical records department at Menard sent Dr. Guyton's office a copy of Plaintiff's CT scans and labs, per her request (*Id.* at 122).   Plaintiff was also seen by Defendant Nurse Marshall on October 10, 2017 for complaints of back pain (*Id.* at 120-21).   Plaintiff's blood pressure was 130/88 (*Id.* at 120). Marshall again referred Plaintiff to see the medical doctor (*Id.*).   Plaintiff testified that there was nothing about this interaction that violated his constitutional rights (Doc. 81-1 at 55).

Plaintiff was seen by a nurse practitioner for a follow-up from his neurology appointment on October 18, 2017 (Doc. 81-2 at 123).   She conducted a neurological examination and noted good range of motion and no loss of sensation, but found some tenderness with palpation on Plaintiff's lower left neck and shoulder (*Id.*).   The nurse practitioner ordered Diclofenac (an NSAID pain and anti-inflammation medication) and a muscle relaxer for 30 days (*Id.*).   Plaintiff was also referred to Dr. Siddiqui to assess Dr. Guyton's remaining recommendation of physical therapy and an MRI of the cervical spine (*Id.*).

Per Dr. Siddiqui's September 22, 2017 order, an x-ray of Plaintiff's shoulder was taken on October 25, 2017, which showed a chronic "ununited facture of the distal end of the left clavicle" (Doc. 81-2 at 124, 236).   Plaintiff saw Dr. Siddiqui on October 30, 2017 for a follow-up from his

Page **7** of 23

shoulder x-rays and to discuss Dr. Guyton's report (Doc. 81-1 at 37; Doc. 81-2 at 124).   Plaintiff's

blood pressure was normal, with a reading of 120/90 (*Id.*).   Dr. Siddiqui ordered physical therapy

for Plaintiff's neck and shoulder, and referred Plaintiff for an MRI of his cervical spine (*Id.*).   On

November 3, 2017, a cervical MRI was approved by Collegial Review, and it was conducted on

November 27, 2017 at St. Elizabeth's Hospital (*Id.* at 125, 182-88).   The findings of the MRI

revealed multilevel disc desiccation (drying) with multilevel annular fissures (ring-like cracks) of

Plaintiff's cervical spine, and stenosis in his C7-T1 foramen (*Id.* at 185-89).

Plaintiff underwent a physical therapy evaluation on November 9, 2017 and was given a

home exercise plan (Doc. 81-1 at 39-40; Doc. 81-2 at 128).   Plaintiff attests the physical therapist

only recommended a home exercise program because the physical therapist did not want to

recommend anything further until after receiving the results of his pending MRI (Doc. 90-8 at ¶ 8).

Plaintiff was scheduled to be seen by a physician on December 13, 2017 for a follow-up from his

MRI; however, Plaintiff was informed the MRI report had not yet been received and the

appointment would need to be rescheduled (Doc. 81-2 at 132).

Plaintiff saw Dr. Siddiqui on January 4, 2018 for complaints of neck and shoulder pain

(Doc. 81-1 at 40; Doc. 81-2 at 133).   St. Elizabeth's Hospital had not yet sent the MRI report, so

Dr. Siddiqui requested that the medical records department call and see if it was available (*Id.*).

Dr. Siddiqui also noted that he would consult through the Collegial Review process to determine

whether an MRI of Plaintiff's shoulder should also be ordered (*Id.*).   The MRI report was

generated the next day and showed some moderate stenosis (narrowing of the spinal canal) (*Id.* at

184-89).   Dr. Siddiqui reviewed Plaintiff's case with Dr. Smith through the Collegial Review

process on January 12, 2018 regarding Plaintiff's shoulder complaints (*Id.* at 190).   They

reviewed Plaintiff's prior imaging, including the MRI, CT scans, and x-rays, and determined to

assess Plaintiff's motor functioning and re-present if there were any abnormalities (*Id.*).   Dr. Siddiqui completed an exam on March 7, 2018 for any neurological deficits related to Plaintiff's stenosis or motor functioning limitations (*Id.* at 143).   Upon examination, Dr. Siddiqui observed some motor weakness in Plaintiff's left-upper extremity, and referred Plaintiff's case back to Collegial Review for an orthopedic consult or another neurological evaluation (*Id.*).   Plaintiff's blood pressure was normal (130/80) at this appointment (*Id.*).

Plaintiff was approved for another neurology consultation by Dr. Siddiqui and Dr. Ritz at Collegial Review on March 16, 2018 (Doc. 81-2 at 194).   The medical records department attempted to schedule a neurology appointment at Barnes Jewish Hospital, but on or about May 7, 2018, the medical records department was notified that the neurology office required Plaintiff's medical records and MRI CD imaging before scheduling an appointment (*Id.* at 152).   Plaintiff was sent a medical release to obtain the CD imaging from St. Elizabeth's Hospital on May 11, 2018 (Doc. 81-1 at 40; Doc. 81-2 at 152).   There is a dispute as to whether the release forms had previously been sent to Plaintiff and were never returned (*Id.*).

Plaintiff saw Dr. Siddiqui on May 14, 2018 (Doc. 81-2 at 157).   In the medical records, Dr. Siddiqui writes that he saw Plaintiff for non-specific reasons and Plaintiff stated no complaints (*Id.*).   Plaintiff, however, asserts he told Dr. Siddiqui about the pain in the left side of his body and the delays in treatment, and Dr. Siddiqui acted like he could not do anything about it (Doc. 90-8 at ¶ 6).   Dr. Siddiqui noted that Plaintiff's neurology appointment had not been scheduled, and requested the medical furlough clerk to follow-up with the neurologist's office (Doc. 81-2 at 157).   Plaintiff was ultimately scheduled for a neurologist appointment on July 26, 2018 (*Id.* at 161).

Plaintiff was examined by Dr. Loftspring, a Washington University neurologist at Barnes Jewish Hospital, as scheduled on July 26, 2018 (Doc. 81-3 at 19-25).   Dr. Loftspring performed a

full neurological assessment of Plaintiff, and observed slow finger tapping and pain with movement in Plaintiff's left upper extremity (*Id.*). Aside from these observations, Plaintiff's neurological testing was normal (*Id.*). Dr. Loftspring ordered Gabapentin and physical therapy for Plaintiff's pain (*Id.*). Dr. Loftspring also found that some of Plaintiff's complaints regarding his left upper extremity may not be neurological, but may be related to a previous injury to his clavicle; thus, he recommended an orthopedic consultation (*Id.* at 25). Plaintiff testified that following the July 26, 2018 appointment with Dr. Loftspring, he had no complaints about Dr. Siddiqui (Doc. 81-1 at 42).

Plaintiff began physical therapy on August 23, 2018, engaging in a regimen of therapy two times per week for six weeks (Doc. 81-1 at 9; Doc. 81-2 at 17).

On November 9, 2018, Plaintiff had another MRI of his cervical spine taken at St. Elizabeth's Hospital (Doc. 81-4 at 44-49). On November 26, 2018, Plaintiff was seen by an orthopedic specialist who described Plaintiff's latest MRI results as a paracentral disc at C 4-5, very mild foraminal stenosis on the right, and no significant central stenosis (*Id.* at 48). The orthopedic specialist recommended a cervical epidural steroid injection, and that Plaintiff continue his current medications (*Id.*). The specialist also recommended Plaintiff see a neurologist for further evaluation of Plaintiff's complaints of facial numbness (*Id.*).

Dr. Siddiqui saw Plaintiff on December 19, 2018 for a follow-up from Plaintiff's orthopedic consultation (Doc. 81-4 at 163). Plaintiff requested a transfer from Menard, but Dr. Siddiqui indicated he had a medical hold due to his upcoming medical appointments (*Id.*). Dr. Siddiqui advised Plaintiff that if he canceled the medical hold, then Plaintiff's medical appointments would also be canceled, but Plaintiff requested that the medical hold be discontinued anyway (*Id.*).

Page **10** of **23**

Plaintiff was transferred to Pontiac Correctional Center ("Pontiac") on April 2, 2019 due to an incident with IDOC staff (Doc. 81-1 at 6, 49).   At Pontiac, Plaintiff continued to see specialists in neurology and orthopedics at the University of Illinois Chicago ("UIC") (*Id.* at 7).   The UIC neurologists explained to Plaintiff that given his age, they were avoiding spinal surgery as the surgery would limit his movement and make it more likely that he would need additional surgeries in the future (*Id.* at 7).

### Complaints regarding Medical Treatment

Plaintiff filed numerous grievances concerning his medical care while at Menard (Doc. 81-1 at 63-68).   Following submission of his first grievance, Plaintiff spoke with Defendant Lashbrook, who was warden at the time (*Id.* at 63).   Plaintiff told Lashbrook what was going on and asked what about the status of his grievance (*Id.*).   Lashbrook told Plaintiff she had no knowledge of the grievance, but that she would take care of everything right away (*Id.*).   Plaintiff admits that his grievances were investigated, but asserts they did not thoroughly investigate as they did not come to Plaintiff personally (*Id.* at 64-65).   Plaintiff also complains that Director Baldwin had knowledge of his complaints through review of his grievances, but failed to take any action (*Id.* at 66).

### Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   Once a properly supported motion for summary

judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).   In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.   *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

Plaintiff is proceeding in this action on claims of deliberate indifference under the Eighth Amendment against Dr. Coe, Nurse Marshall, Dr. Siddiqui, Nurse Walter, Warden Lashbrook and Director Baldwin concerning his neck pain and high blood pressure, and against Wexford for implementing policies of delaying and/or denying care for these conditions.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment.   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind."   *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*,

546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A factfinder may also conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* (internal quotations omitted).

Defendants did not set forth any argument that Plaintiff's conditions did not constitute a serious medical need, so this point is conceded for purposes of summary judgment.

### Dr. Coe

Dr. Coe asserts he only saw Plaintiff on three occasions before his retirement and on these occasions, he provided adequate medical treatment to address Plaintiff's complaints. In viewing the evidence in the light most favorable to Plaintiff, it appears Dr. Coe first examined Plaintiff on

May 4, 2017 in Plaintiff's housing unit to address Plaintiff's complaints of ear pain[1].   Dr. Coe completed an exam and diagnosed Plaintiff with head pain and vertigo problems.   Dr. Coe did not have instruments to check Plaintiff's eyes and ears, so he ordered a follow-up appointment in one week.   It is undisputed that Plaintiff was not scheduled for a one-week follow-up.   It is also undisputed that Dr. Coe does not schedule follow-up appointments himself; rather, he relies on the nurse to schedule the same.   Although Plaintiff was not seen for a follow-up with Dr. Coe by May 11, 2017, he saw a nurse for complaints of ear pain and a headache on May 13, 2017, and ultimately saw Dr. Coe on May 24, 2017.   The May 24, 2017 appointment was not for a follow-up to the earlier May 2017 exam, but rather, was for a routine physical.   Dr. Coe failed to document Plaintiff's complaints of ear and shoulder pain in his medical records; however, Dr. Coe ordered Motrin twice a day to address Plaintiff's complaints of back and head pain.   Dr. Coe again examined Plaintiff for complaints of ear pain on June 8, 2017.   This is the last time Dr. Coe examined Plaintiff.   Plaintiff contends Dr. Coe's examination of his ear was "rough" and that Dr. Coe directed abusive language at him, indicating he had AIDS and that "people die here."   Dr. Coe diagnosed Plaintiff with an ear wax gland problem and ordered ear drops and Motrin on a more frequent basis.

First, the Court rejects Plaintiff's contention that Dr. Coe engaged in verbal harassment that amounted to cruel and unusual punishment.   Plaintiff is attempting to insert a new claim that was not identified by the Court in the screening order or briefed by Defendants in their motion for summary judgment.   The Court will not allow Plaintiff to amend his complaint in this manner and any argument regarding this issue is moot.

---

[1] Although the screening order limited the conditions at issue to neck pain and high blood pressure, the Court finds that Plaintiff's complaints concerning ear and shoulder pain are inextricably linked; thus, the Court will consider these conditions as if they were encompassed in the claims set forth in the screening order.

Next, the Court finds that Dr. Coe did not act with deliberate indifference in his treatment of Plaintiff's neck pain and blood pressure during the brief period in which Plaintiff was in his care.   While the Court recognizes there was some delay in receiving a follow-up appointment with Dr. Coe following his May 4, 2017 exam, there is no indication that such delay amounted to deliberate indifference as there is no indication it exacerbated Plaintiff's condition or prolonged his pain for Dr. Coe had already ordered him pain medication.   *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.   The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (internal quotations and citations omitted).   Finally, although Dr. Coe was unable to resolve Plaintiff's complaints of neck pain, he only saw Plaintiff for his complaints for approximately one month, and issued ear drops and Motrin to address the same.   Although Plaintiff may not have agreed with Dr. Coe's treatment regimen or decisions, it is well-established that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate."   *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).   In this instance, there is simply no evidence that Dr. Coe's prescribed course of treatment was "blatantly inappropriate."   Dr. Coe is therefore entitled to summary judgment.

### Dr. Siddiqui

Dr. Siddiqui asserts summary judgment in his favor is appropriate as he promptly and repeatedly addressed Plaintiff's complaints and referred him for appropriate specialty care.   Dr. Siddiqui argues Plaintiff seeks to hold him liable for alleged delays by outside providers.   In

response to Dr. Siddiqui's motion, Plaintiff asserts that despite Dr. Siddiqui's job description stating it was his duty to supervise all medical staff, he failed to do so.   Plaintiff argues these delays in medical treatment prolonged Plaintiff's suffering.

Notably, Plaintiff does not allege that he was wholly ignored by Defendant Dr. Siddiqui or other medical providers at Menard; rather, Plaintiff asserts there were delays in receiving outside consultations and implementing specialists' treatment recommendations.   First, the Court finds that Plaintiff's attempt to hold Dr. Siddiqui liable for actions of other medical personnel (including outside providers), even as the medical director, is not appropriate under § 1983 as there is no *respondeat superior* liability.   *See Sanville v. McCaughtry*, 266 F.3d 724, 739-40 (7th Cir. 2001).

The Court further finds that the evidence before the Court does not support Plaintiff's allegations that Dr. Siddiqui was deliberately indifferent or that any delays in Plaintiff's medical treatment could be attributed to Dr. Siddiqui.   Indeed, the evidence, when viewed in a light most favorable to Plaintiff, reveals that Plaintiff regularly sought treatment and was examined by Dr. Siddiqui, as well as other on-site and outside physicians, for complaints concerning dizziness, left neck and ear pain, back pain, and headaches.   In particular, the Court notes that Dr. Siddiqui saw Plaintiff at least eight times over a fourteen-month period to address his complaints (February 2017 to May 2018).   More importantly, the medical records demonstrate that Dr. Siddiqui not only saw and examined Plaintiff regularly, but consistently referred Plaintiff, and consulted with other Wexford physicians, about Plaintiff's case.   Dr. Siddiqui ensured Plaintiff was seen by outside specialists, including two neurologists and an orthopedist.   Moreover, Plaintiff underwent significant testing, including a CT scan, two MRIs, and x-rays, none of which proved to be determinative in diagnosing Plaintiff's condition.   Accordingly, during the relevant time period, Plaintiff's medical providers, including Dr. Siddiqui, evaluated potential diagnoses and prescribed

treatments meant to address Plaintiff's symptoms.

In attempting to treat possible diagnoses, Plaintiff was prescribed various treatments, including a variety of medications, in an attempt to alleviate Plaintiff's discomfort.   In reviewing the medical records, the Court finds no evidence that Dr. Siddiqui delayed specialist consultations or failed to address their recommendations.   Rather, the evidence tends to reveal the opposite, demonstrating that Dr. Siddiqui and other medical personnel at Menard consistently prescribed medication and used diagnostic tools to address Plaintiff's complaints.

While Plaintiff clearly disagrees with Dr. Siddiqui's course of treatment and is apparently frustrated by the difficulties met by medical providers in properly diagnosing and treating his condition, it is well-established that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate."  *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).   Making such a showing is not easy as "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'"  *Pyles*, 771 F.3d at 409 (quoting *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (other quotation omitted)).   In other words, federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.  *Pyles*, 771 F.3d at 409 (citations omitted).

There is no evidence that Dr. Siddiqui's prescribed course of treatment was "blatantly inappropriate."   Rather, the evidence demonstrates that Dr. Siddiqui examined Plaintiff multiple

times and, in consultation with, or at the direction of other physicians, referred Plaintiff for a variety of diagnostic tests and specialist consultations in an attempt to treat his complaints. Although such treatments were apparently unsuccessful, the records fail to demonstrate that such lack of success was the result of Dr. Siddiqui's deliberate indifference.   Accordingly, the Court finds that Dr. Siddiqui's treatment of Plaintiff was grounded in professional judgment and was reasonable.   *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008).   For the above-mentioned reasons, Defendant Dr. Siddiqui is entitled to summary judgment.

### Nurse Marshall

Nurse Marshall asserts she saw Plaintiff on three occasions and assessed Plaintiff's medical needs and made the best decision she could on how to provide care for Plaintiff. Marshall asserts her actions do not come close to the level of disregard required to show deliberate indifference.

In viewing the evidence in Plaintiff's favor, it appears Defendant Marshall saw Plaintiff on three occasions for various complaints.   More specifically, Defendant Marshall saw Plaintiff on April 9, 2017 for hypertension, on May 13, 2017 for ear pain and headache, and on October 10, 2017 for back pain.   Nurse Marshall referred Plaintiff to a physician on all three occasions. Plaintiff seems to focus his concerns on Marshall's failure to make an emergency referral to a physician on April 9, 2017.

According to Plaintiff's medical records, an emergency referral should be made when "BP greater than or equal to 180/120, or if lower and accompanied by headache, blurred vision, chest pain, palpitations, and dizziness."   Plaintiff's blood pressure readings on April 9, 2017 were 170/100 and 132/100, and he complained of headache, blurred vision, dizziness, and shortness of breath.   Thus, Plaintiff argues that, according to the medical records, Plaintiff's complaints should

have been met with an emergency referral.   It is not disputed that no emergency referral was made, and that Plaintiff did not see a physician, Dr. Coe, until May 4, 2017.   While Nurse Marshall may have failed to follow policy, the Court cannot find her actions on April 9, 2017 amounted to deliberate indifference.   First, the Court finds she used her medical judgment and referred Plaintiff to a physician.   The failure to follow a written policy is not, in and of itself, deliberate indifference.   Moreover, as reiterated by the Seventh Circuit Court of Appeals in *Gabb v. Wexford Health Sources, Inc.*, in order to succeed in a § 1983 suit, a plaintiff must "establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages."   945 F.3d 1027, 1032 (7th Cir. 2019) (internal quotations omitted) (emphasis in original).   Thus, in *Gabb*, the court found the entry of summary judgment in favor of the medical providers appropriate because there was no evidence the plaintiff suffered harm as a result of the actions complained of in that case.   In this instance, there is similarly no evidence that Marshall's failure to issue an emergency referral caused Plaintiff discernable harm.

The Court further finds that Marshall's treatment of Plaintiff's medical complaints on May 13, 2017 and October 10, 2017 was not "blatantly inappropriate" as she examined Plaintiff and referred him to a physician for further treatment.   Further, Plaintiff testified there was nothing about Marshall's treatment on October 10, 2017 that violated his constitutional rights.

For these reasons, Nurse Marshall is entitled to summary judgment.

### Nurse Walter

Defendant Nurse Walter saw Plaintiff three times on June 10, 2017.   Plaintiff came to the healthcare unit that day for a possible seizure, and Dr. Siddiqui initially placed Plaintiff on a 23-hour observation.   Walter checked on Plaintiff at 9:45 a.m., 3:45 p.m., and 6:45 p.m., taking his vitals and relaying information to Dr. Siddiqui.   It is undisputed that Plaintiff was discharged

prior to the 23-hour period expiring.   According to Plaintiff, this occurred because he was told he was going to be placed with an inmate who had a history of fighting, and Walter relayed to Dr. Siddiqui that Plaintiff could do the same "thing" in his cell, and they could continue to check on him (Doc. 81-1 at 33).

Although it is undisputed that Plaintiff was discharged prior to completing 23-hours in observation, the Court finds this does not rise to a level of deliberate indifference as to Defendant Walter.   While Plaintiff was in the healthcare unit, Walter took Plaintiff's vitals and relayed necessary information to Dr. Siddiqui, who ultimately determined Plaintiff could be discharged. Importantly, Plaintiff has not presented evidence that he was harmed by Walter's actions, including the early discharge.   As mentioned above, harm is a necessary element of a § 1983 claim.   *See Gabb*, 945 F.3d at 1032-33.   Accordingly, the Court finds no reasonable jury could find Defendant Walter acted with deliberate indifference to Plaintiff's condition and Walter is entitled to summary judgment.

### *Warden Lashbrook and Director Baldwin*

Plaintiff asserts Defendants Lashbrook and Baldwin were deliberately indifferent to his serious medical needs when they failed to act on grievances he submitted regarding his medical treatment.

Plaintiff also interjects a new argument in response to summary judgment, arguing Lashbrook and Baldwin failed to supervise the medical records department at Menard, causing multiple delays in his medical treatment.   The Court will not allow Plaintiff to interject such a claim at this late stage in the proceedings.   Moreover, as mentioned above, a "failure to supervise" claim is not proper as the doctrine of *respondeat superior* does not apply to § 1983 actions, and Plaintiff has not set forth sufficient evidence to find personal liability on this issue.   *See Sanville v.*

*McCaughtry*, 266 F.3d 724, 739-40 (7th Cir. 2001).

It is undisputed that Plaintiff submitted multiple emergency grievances concerning his medical treatment.   It is further undisputed that these grievances were investigated, but Plaintiff was not contacted.   Defendants' involvement in these grievances was signing off on findings by other staff members.   Defendants Lashbrook and Baldwin did not have direct involvement in Plaintiff's medical care, and they are not medical providers.   As such, Lashbrook and Baldwin were entitled to defer to the judgment of Plaintiff's treating physicians, and need not have second-guessed their medical judgment.  *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (nonmedical personnel are entitled to defer to the judgment of health professionals so long as they do not ignore the prisoner).   There is no evidence that Plaintiff's grievances were ignored by Lashbrook or Baldwin.   Based on the information provided, it was apparent Plaintiff was being treated and he was regularly being seen by a physician.   Accordingly, no reasonable jury could find Defendants Lashbrook or Baldwin failed to respond to a substantial risk of harm to Plaintiff's health and they are entitled to summary judgment.

### *Wexford*

Plaintiff asserts Wexford maintained an unconstitutional policy of denying treatment for chronic pain and high blood pressure.   In support of his argument, Plaintiff relies on Dr. Siddiqui's deposition testimony wherein he stated that he does not supervise the medical staff despite the fact that his job description requires it.   Plaintiff asserts the lack of supervision is evident by the constant delays in Plaintiff's medical treatment, which caused a delay in determining a proper course of treatment.

Wexford argues Plaintiff failed to identify any written Wexford policy, practice, or procedure he claims violated his rights.   Wexford also argues Plaintiff failed to produce evidence

of a practice or procedure of delaying and denying medical care or refusing to adequately supervise its employees.

Where a private corporation has contracted to provide essential government services, such as health care for prisoners, the private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  Accordingly, in order for Plaintiff to recover from Wexford, he must offer evidence that an injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Shields*, 746 F.3d at 796.  Plaintiff must also show that policymakers were aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).  Finally, a policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted).

Here, Plaintiff asserts there were delays in his care due to a lack of supervision of Wexford medical personnel.  Plaintiff's complaint of systemic treatment delays is belied by the record. Although the Court notes there is evidence of an occasional scheduling error, there is no evidence this occurred because of a widespread policy or practice attributable to Wexford.  Further, Plaintiff fails to link the alleged lack of supervision by Dr. Siddiqui to any particular delay within Wexford's control.  Indeed, most of the delays Plaintiff complains of are attributable to outside specialists.  Moreover, Plaintiff fails to show he suffered any discernable injury due to the alleged lack of supervision by Dr. Siddiqui.  For these reasons, Wexford is entitled to summary judgment.

## Conclusion

Based on the foregoing, the Motion for Summary Judgment filed by Defendants Dr. Siddiqui, Dr. Coe, and Wexford Health Sources, Inc. (Doc. 80), and the Motion for Summary Judgment filed by Defendants Baldwin, Lashbrook, Walter, and Marshall (Doc. 88) are **GRANTED**.  The Clerk of Court is directed to enter judgment in favor of Dr. Mohammed Siddiqui, Dr. John Coe, Wexford Health Sources, Inc., John Baldwin, Jacqueline Lashbrook, Angie Walter, and Nicole Marshall and against Chris Njos, and close this case.

**IT IS SO ORDERED.**

**DATED: March 12, 2021**

_s/  Reona J. Daly_
**Hon. Reona J. Daly**
**United States Magistrate Judge**